## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MARLON WALKER, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 22-2511-BAH |
| BOARD OF EDUCATION OF CHARLES COUNTY ET AL., | * | |
| Defendants. | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　.\*　　\*　　\*

### <u>MEMORANDUM OPINION</u>

Plaintiff Marlon Walker brought suit against the Board of Education of Charles County ("the Board"), Superintendent Kimberly Hill, and Deputy Superintendent Amy Hollstein (collectively "Defendants") alleging violations of federal and state antidiscrimination law. ECF 1. Pending before the Court is Defendants' motion for summary judgment. ECF 46. Plaintiff filed a response, ECF 47, and Defendants filed a reply, ECF 48. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' Motion is **GRANTED**.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I.    BACKGROUND[2]

### A.    Factual Background

#### 1.    General background

Plaintiff, an African American man, is an employee of the Charles County Public School System and has held the position of assistant principal within the system since 2011. ECF 46-3 (Plaintiff's Record of Experience), at 1–2. Plaintiff has been an assistant principal at both the high school and middle school levels. *Id.* His claims initially arose from his non-selection for the position of principal over the course of several years, with his first application being in 2016.[3] ECF 1, at 3 ¶ 21. Plaintiff was not selected for the principal position in 2016, and though he applied seven additional times over the course of the next six years, he was not selected for any principal position. ECF 46-7 (Plaintiff's deposition), at 2, 58:4–60:6.

---

[2] The Court notes that Federal Rule of Civil Procedure 56(c) places the burden on the party responding to a motion for summary judgment to show that a fact is genuinely disputed by "*citing* to particular parts of materials in the record," or by "showing that the materials *cited* do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B) (emphasis added). Thus, a party fails "to satisfy its burden under Rule 56 by generally citing to an affidavit or deposition without providing a specific citation to the particular portion of the affidavit or deposition upon which the party relies for its factual assertion." *Beverly v. Sugar Mountain Resort, Inc., & Sugar Mountain Ski Resort, LLC*, No. 1:14CV321, 2016 WL 815299, at *1 (W.D.N.C. Feb. 29, 2016) (citing Fed. R. Civ. P. 56 (c)(1)). Plaintiff attaches to his response answers to interrogatories, ECF 47-1, and deposition transcripts, *see* ECFs 47-2, 47-3, 47-4 (portions of Nikial Majors's deposition). However, in his brief opposing summary judgment, Plaintiff cites only to a few specific answers to interrogatories and broadly references multiple pages of the attached deposition transcripts. Plaintiff largely repeats the factual narrative included in the complaint, *see* ECF 47, 1–12, but the complaint is not verified and thus does not have "evidentiary value." *Goodman v. Diggs*, 986 F.3d 493, 499 (4th Cir. 2021). In addition to failing to satisfy Plaintiff's burden under Rule 56, this makes the Court's task of constructing a coherent narrative of facts difficult. However, since the Court may, in its discretion, consider other materials in the record, even if not specifically cited by the parties, *see* Fed. R. Civ. P. 56(c)(3), the Court's factual narrative is derived from the exhibits appended to the parties' filings, *see generally* ECFs 46, 47, and 48.

[3] As explained below, the parties later stipulated that Plaintiff's claims pertain only to the selection process that occurred in 2020. *See* ECF 15 (Stipulation of the Parties).

In his deposition, Plaintiff attested that by early 2017, he began to feel that he was being "passed over" for the position of principal on the basis of his race. ECF 46-7, at 5, 81:3–12. In February of that year, Plaintiff met with Pam Murphy, the then-Director of Human Resources for Charles County Public Schools. *Id.* at 80:8–14. Plaintiff attests that he informed Murphy in 2017 of his perception that "Charles County struggled with hiring African American males as principal." *Id.* at 80:15–19. Murphy, for her part, says she "does not have any independent memory of [Plaintiff] expressing an interest in filing or initiating a formal internal complaint"; had Plaintiff indeed expressed such an interest, Murphy says, she would have referred the matter to case manager Melissa Dronsfield, who likewise does not have any record or independent memory of Plaintiff filing an internal complaint. ECF 46-31 (Defendants' answers to Plaintiff's interrogatories), at 1–2; *see also* ECF 47-1 (Plaintiff's exhibit of the same interrogatories), at 6–7.

The following year, in March of 2018, after he had again not been selected for promotion to principal, Plaintiff "contacted Janice Wilson, President of the Charles County NAACP, to complain about race discrimination in Charles County Public Schools' selection process for principals." ECF 46-7, at 7, 100:13–19; *see also* ECF 46-31, at 2. A few weeks later, Wilson, along with the NAACP's Legal Redress Chair Pete Williams, met with Amy Hollstein, Deputy Superintendent of Charles County Public Schools, to discuss why Plaintiff had not been selected. *Id.* Plaintiff indicated in deposition that Hollstein "did not offer a tangible reason" for his "nonselection" during this conversation with Wilson and Williams. ECF 46-7, at 7, 101:15–21. By contrast, in response to interrogatories propounded by Plaintiff, Defendants report that upon conclusion of the meeting, Wilson stated that she found the process to be "very fair" and that Hollstein "did not discuss specifics related to [Plaintiff's] interview performance or that of the other applicants as it was not [ ] practice to discuss such personnel matters." ECF 46-31, at 2.

3

Around this same time, Wilson and Williams also met with Nikial Majors, the new Director of Human Resources for Charles County Public Schools.[4]  ECF 46-34 (deposition of Majors), at 6, 71:2–8.

Around the same time in the spring of 2018, Hollstein met with Plaintiff's union representative Courtney Dowling, who reported that Plaintiff had "contacted her regarding concerns about the Principal selection process." ECF 47-1, at 9.  Defendants attest that Hollstein "reviewed the Principal selection process in detail with Dowling" and that, following the discussion, "Dowling did not lodge a complaint on Walker's behalf, and thus Hollstein did not investigate the matter any further." *Id.*

In April of 2018, Plaintiff contacted Majors and asked to arrange a meeting with Hollstein, Superintendent Kimberly Hill, Executive Director Linda Gill, and Executive Director Marvin Jones to discuss "being passed over for promotion to principal." ECF 46-33 (Defendants' responses to Plaintiff's interrogatories), at 1; *see also* ECF 47-1, at 10.  Majors arranged the meeting, which Hill did not attend but Hollstein, Gill, and Jones did.  ECF 46-33, at 1.  According to Plaintiff, Jones arrived thirty minutes late for the one-hour meeting, which "disgusted" him because, as Plaintiff explained in his deposition, he felt Jones should not "show up [late] to a meeting without phoning or calling ahead." ECF 46-7, at 10, 137:12–20.  In Defendants' version of events, "Jones was late to the meeting due to an obligation at school and, upon his arrival, apologized to all in attendance despite the fact that his tardiness was unavoidable," but Plaintiff "was furious and would not accept Jones'[s] apology." ECF 46-33, at 1.

The group convened for a second meeting, at which time Plaintiff, accompanied by Dowling, asked Hollstein to see Plaintiff's scores from the selection committee but Hollstein,

---

[4] Majors stated in her deposition testimony that she is African American. ECF 46-34, at 6, 72:10.

Plaintiff alleges, responded that she could not show Plaintiff the scores. ECF 46-7, at 11, 142:12–14. Defendants attest that Hollstein did not produce the scores on "advice of counsel, because the attendees had already discussed Walker's performance at length . . . ." ECF 46-33, at 1. They further state that, at the second meeting, the Board members "discussed the Principal selection process in detail and why it was not discriminatory in general or as to [Plaintiff] specifically." *Id.*

Around this same time, Plaintiff indicates that he heard from his colleague Kevin Jackson that Majors had said to Jackson that Plaintiff was known as "an angry black man." ECF 46-7, at 9, 116:20–21, 117:13–14. In her deposition testimony, Majors acknowledged that she referred to Plaintiff as "an angry black man," but said she did so in an April 2018 conversation with Hollstein. ECF 46-34, at 2, 8:15–22. Majors attested that she made the comment after the first meeting between Plaintiff and the school members, at which time Plaintiff had allegedly expressed anger at Jones's lateness. *Id.* at 19:1–17. Majors described her "understanding of that term" as being "when people feel entitled to something based on their race" and indicated she meant to communicate that Plaintiff "was attempting to invoke his own race to his advantage." *Id.* at 5, 54:3–7 and 6, 71:19–22. There is some confusion in the record as to who else may have been privy to these comments: while Majors testified that she did not "recall" using the term with anyone except for Hollstein, *id.* at 4, 22:3–4, Jackson, an African American man who has served as the principal of St. Thomas Jenifer Elementary School since 2019, attested in affidavit that he had a conversation with Majors during which "Majors referred to [Plaintiff] as an 'angry black man,'" ECF 46-35, at 1. Jackson said he "spoke with [Plaintiff]" and though he does "not recall indicating that Ms. Majors was the individual who referred to [Plaintiff] as an 'angry black man,'" he "encouraged [Plaintiff] to be positive and try to come across as positive in his interactions with others, including in his [p]rincipal interviews." *Id.* at 1–2. In her deposition, Majors acknowledged

that she had "one conversation with Mr. Jackson about [Plaintiff], and that conversation was to ask [Jackson] if he would serve as an informal mentor [to Plaintiff]." ECF 46-34, at 4, 22:15–18.

### 2. The 2020 selection process[5]

In an affidavit, Hollstein indicated that the principal selection process for the 2020–2021 school year began around February 2020. ECF 46-5, at 1 ¶ 4. She attested that, in collaboration with Gill and Jones, she selected "Director of Student Services Kathy Kiessling and Human Resources Specialist Kevin Howard to serve" on the principal selection panel alongside Gill and Jones. *Id.* Hollstein averred that she "made it a priority to ensure that the [p]anel was diverse in terms of race, age, and sex, and also in terms of subject matter knowledge and experience." *Id.* Further, Hollstein said, each year she chose the threshold score for all applicants' admission into a smaller pool of ideal candidates, adjusting the score "higher if there are fewer principal position vacancies or lower if there are more principal position vacancies." *Id.* ¶ 5. She noted that because in March 2020, there "were no principal position openings for the following school year, [ ] [she] set the threshold score relatively high—at 100." *Id.* Eight employees, including Plaintiff, were considered for selection into the principal pool of ideal candidates in early 2020.[6] ECF 46-6, at 1 ¶ 5 (affidavit of Majors).

The four members of the initial selection panel also submitted affidavits. Howard, who described himself as a fifty-year-old "African American male," attested that prior to interviewing the candidates for admission into the smaller pool, he and his fellow panel members "created seven questions that [they] would ask each candidate based upon various qualities [they] believed were

---

[5] As noted *supra* at note 3 (and as further explained in the Court's discussion of the case's procedural history), the Parties agree that Plaintiff's claims pertain only to the selection process that occurred in 2020. *See* ECF 15 (Stipulation of the Parties).

[6] According to Majors, five of the candidates were male and three were female, while five were Caucasian and three were African American. ECF 46-6, at 2 ¶ 5.

necessary for the [p]osition" of principal. ECF 46-8, at 1 ¶ 3, 2 ¶ 7. Gill attested to the same, *see*

ECF 46-9, at 1 ¶ 6, as did Jones, *see* ECF 46-10, at 2 ¶ 6, and Kiessling, *see* ECF 46-11, at 1 ¶ 6.

Gill described herself as a fifty-two-year-old "Caucasian female," ECF 46-9, at 1 ¶ 3, while Jones

described himself as a fifty-year-old "African American male," ECF 46-10, at 1 ¶ 3, and Kiessling

described herself as a sixty-one-year-old "Caucasian/Asian female," ECF 46-11, at 1 ¶ 3.

During the selection interviews, the panel members took notes on standardized interview

sheets. *See, e.g.*, ECF 46-12. These sheets reflect that the panelists asked the candidates the

following questions:

1. Tell us where you are working now and one initiative you are currently working on that excites you.
2. Refer to your email inbox.[7] It is 7:30 a.m. on Monday morning at Starkey School. You are the Principal. Identify which of these five things you would handle between 7:30 and 8:30 a.m. Explain: why you would select those 5 items and how you would handle them.
3. At 9:00, you have a Parent Advisory Council meeting where the potential for a host of topics could arise for discussion. Identify one significant issue impacting your school and what you, the principal, are doing to address it. For the purpose of this task, think about the needs of your current school.
4. At 10:00, you will plan to address concerns about your school's Maryland Comprehensive Assessment Program (MCAP) scores. Talk about what this planning session will consist of; how will you attack the issue of increasing student achievement on the standardized testing at your school?
5. Your students with IEPs [individualized education plans] are being suspended much more than students without IEPs. What will be your plan of action to address this issue?
6. Your phone call with the Director of Human Resources reveals that your music teacher is threatening to resign because she is overwhelmed by her job duties: planning, teaching, grading, concert preparation, staff meetings, parent phone calls, etc. What measures will you take upon receipt of this information?
7. Is there anything you haven't shared that would further affirm you are the best candidate for the position?

---

[7] From the marginal notes made by members of the selection panel, this exercise appears to have been a simulated one in which the candidate was presented several mock emails covering such topics as bus routes and student safety. *See, e.g.*, ECF 46-14, at 2.

ECF 46-12, at 1–3. All panelists attested that they "did not take the race, sex, or age of the Principal Pool candidates into account when making [their] decision as to who was the most qualified candidate and best fit for the [p]osition." ECF 46-11, at 2 ¶ 9; *see also* ECFs 46-10, at 2 ¶ 9; 46-9, at 2 ¶ 9; and 46-8, at 2 ¶ 10. Moreover, all panelists attested in separate affidavits that they had "never heard anyone refer to [Plaintiff] as an 'angry black man,' including [ ] Majors, [ ] Hollstein, and [ ] Jackson" and therefore had "never heard anyone refer to [Plaintiff] by that phrase as of the spring of 2020." ECF 46-37, at 1 ¶ 4 (second affidavit of Jones); *see also* ECFs 46-38, at 1 ¶ 4 (second affidavit of Gill), 46-39, at 1 ¶ 4 (second affidavit of Kiessling), and 46-40, at 1 ¶ 4 (second affidavit of Howard).

The panel interviewed Plaintiff on March 3, 2020. *See* ECF 46-12, at 1. The panelists wrote down comments and impressions from the interview on their standardized interview sheet. Jones's comments indicated that he thought Plaintiff "came across as over-confident" and that he "wouldn't be as receptive to different perspectives," ECF 46-12, at 1, while Howard said that Plaintiff "appear[ed] over confident" and "speaks down to folks (potentially)," ECF 46-13, at 1. Kiessling's interview notes reflected that Plaintiff "did not know that disproportionality [of suspension rates] is happening w[ith] spec[ial] ed[ucation]," "did not answer all questions w[ith] specific answers," and appeared to have "concern for only certain groups of students." ECF 46-14, at 1. Finally, Gill's notes indicated that Plaintiff "took offense at some questions," seemingly question six in particular, as indicated by his response, "I would know if a teacher is struggling." ECF 46-15, at 1.

Each interviewee received a score from each panelist. The scores were calculated based on scoring on a scale of 0 to 4 across nine areas: experience, "human relations skills," "confidence/enthusiasm," professional development, understanding of the requirements for the

position, leadership, knowledge, "ability to express ideas," and references. *See, e.g.*, ECF 46-16, at 4. At the end of Plaintiff's interview, Gill assigned Plaintiff a score of 24 while Jones assigned him a score of 21, both indicating that they recommended Plaintiff for selection to the smaller pool but did so "with reservations." ECFs 46-15, at 1 and 46-12, at 1. Kiessling assigned Plaintiff a score of 26, reflecting her position that he be recommended for the pool, but Howard assigned Plaintiff a score of 18 and did not recommend his advancement. ECFs 46-14, at 1 and 46-13, at 1.

Plaintiff's total score amounted to 89, below the 100-point threshold requirement for entry into the pool. ECF 46-17, at 1. Three other candidates failed to clear the threshold, earning scores of 88, 96, and 76. *Id.* The four candidates who did advance earned scores of 105, 103, 130.5, and 103. *Id.* Defendants have provided the interview notes for all eight initial candidates. *See* ECF 46-18.

The four successful candidates were interviewed by a panel consisting of Hill, Hollstein, Majors, and Assistant Superintendent Michael Heim. ECF 46-20, at 1 ¶ 4 (affidavit of Heim). "Shortly after" these interviews were conducted, a vacancy became available at Theodore Davis Middle School, and the panel selected a candidate named Robert Griffiths "to be assigned as principal of that school effective the start of the 2020–2021 school year." *Id.* ¶ 5. Defendants have also produced interview notes and scores from the panel that ultimately selected the new principal. *See* ECFs 46-21 and 46-22.

In his deposition, Plaintiff stressed that he had "significantly more experience" than the other, successful candidates in the selection process and that his "years of experience and [ ] years of being an assistant principal" made him more qualified relative to these candidates. ECF 46-7, at 13, 164:1–10. On September 23, 2020, Plaintiff emailed Majors to state his intent to file "a

9

formal complaint [of discrimination] against Charles County Public Schools." ECF 46-25 (copy

of the email exchange), at 1. Majors responded and explained that she had found the selection

process to be "not discriminatory" but asked for further evidence to continue to investigate

Plaintiff's claim. *Id.* On October 20, 2020, after his exchange with Majors, Plaintiff filed a charge

of discrimination against Charles County Public Schools with the Maryland Commission on Civil

Rights (the "Commission"). ECF 46-26, at 1–2 (copy of Plaintiff's submission to the

Commission). The Commission ultimately determined that there was "[n]o [p]robable [c]ause to

believe that the [Defendants] discriminated against [Plaintiff] . . . ." ECF 46-27, at 5.

### B.    Procedural History

Plaintiff initiated this suit on October 3, 2022. *See* ECF 1. On November 30, 2022, the

parties filed a Joint Status Report indicating that Plaintiff agreed to a Stipulation such that he would

only pursue his claims pursuant to his non-selection in 2020, not for all the years he alleged that

he had been passed over for promotion. *See* ECF 12, Joint Status Report, and ECF 15, Stipulation.

Judge Chuang approved the stipulation on December 5, 2022. ECF 14. The case was transferred

to the undersigned on October 23, 2023.

In keeping with the Parties' stipulation, Plaintiff's claims—Title VII claims for

discrimination on the basis of race (Count I) and gender (Count II), 42 U.S.C. § 1983 claims against

Hill (Count III) and Hollstein (Count IV), and a claim under the Maryland Fair Employment

Practice Act ("MFEPA") (Count V)—pertain only to his non-selection in 2020. ECF 1, at 14–15

¶¶ 97–105, and ECF 15.

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether

10

the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

Plaintiff's complaint enumerates five counts: discrimination on the basis of race in violation of Title VII of the Civil Rights Act ("Title VII") (Count I); discrimination on the basis of gender in violation of Title VII; "42 U.S.C. § 1983 (Race/Gender)" against Defendant Hill (Count III); "42 U.S.C. § 1983 (Race/Gender)" against Defendant Hollstein (Count IV); and violation of Md. Code, State Government, § 20-606, where MFEPA is codified (Count V). The Court analyzes each aspect of Plaintiff's claims in turn.

### A.   Title VII Claims

Title VII provides that an employer may not "discriminate against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff bringing a Title VII discrimination claim may "demonstrate through direct or circumstantial evidence that discrimination motivated the adverse employment action." *Rorie v. Bd. of Educ. of Charles Cnty.*, 653 F. Supp. 3d 217, 230 (D. Md. 2023); *see also Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (explaining that this first avenue of proof is established through "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue"). Under this approach, also known as the "mixed-motive framework," a

plaintiff may succeed if they "'demonstrate[] that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Ousley v. McDonald*, 648 F. App'x 346, 349 (4th Cir. 2016) (quoting *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005)). The evidence offered "must both display a discriminatory attitude and bear a causal relationship with the adverse employment action." *Id.* (internal citation omitted).

A Title VII claim may also proceed according to the framework announced by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Under the *McDonnell Douglas* proof scheme, a plaintiff must first establish a prima facie case of discrimination before the burden shifts back to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts again to a plaintiff to show that the employer's proffered reasons are pretextual. *Id.* at 804. The *McDonnell Douglas* test "is intended to be flexible, 'not onerous,' and is designed to uncover 'circumstances which give rise to an inference of unlawful discrimination.'" *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 433 (D. Md. 2022) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "However, 'the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.'" *Id.* (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)). "Although the avenues of proof pertain to trial, they are also relevant at the summary judgment stage." *Id.*

Though Defendants analyze Plaintiff's claims in line with the *McDonnell Douglas* standard, *see* ECF 46-1, at 16, it is not immediately clear whether Plaintiff advances his claims through the presentation of direct evidence or through the use of the burden-shifting framework.

In his deposition, Plaintiff explained that he felt he had been discriminated against because "there were not many African American male administrators in the system" and because he had been repeatedly "passed over" for the position of principal. ECF 46-7, at 5, 8:7–11. Defendants construe this statement as an admission that Plaintiff does not have the requisite evidence of discrimination to support his claims and may therefore only proceed under the *McDonnell Douglas* framework. ECF 46-1, at 16 (citing ECF 46-7, at 5, 81:9–12). However, Plaintiff appears to support his argument that Defendants should be denied summary judgment by reference to caselaw applying both *McDonnell Douglas* as well as the relevant standard when direct or indirect evidence is at issue. *See* ECF 47, at 15–16. The Court will therefore first evaluate whether Plaintiff has provided sufficient evidence of racial discrimination under "ordinary principles of proof." *Burns*, 96 F.3d at 731.

Plaintiff cites Majors's comment that Plaintiff was "an angry black man" as direct evidence of racial and gender discrimination. ECF 47, at 14. This argument relies on Majors's status as the Executive Director of Human Resources and her role in the evaluation of the four candidates who had successfully advanced beyond the initial interview stage in 2020. *Id.* at 12. He also points to the fact that Majors made the comment to Hollstein, who "oversaw the principal selection process." *Id.* at 13.[8] "The Fourth Circuit has held that comments proffered as direct evidence of discrimination must be made by a final decisionmaker involved in the alleged adverse employment action." *Hood-Wilson v. Bd. of Trustees of Cmty. Coll. of Baltimore Cnty.*, Civ. No. 20-0124-LKG, 2024 WL 4893641, at *6 (D. Md. Nov. 26, 2024) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 289 (4th Cir. 2004), *overruled in part on other grounds by Gross v.*

---

[8] There is no claim that Jackson, the principal of St. Thomas Jenifer Elementary School who alleges he heard a similar comment from Majors in 2018, *see* ECF 46-35, at 1–2, played any role in the 2020 selection process.

*FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *see also Schafer v. Md. Dep't of Health & Mental Hygiene*, 359 F. App'x 385, 389 (4th Cir. 2009) (determining that the relevant question is whether "an actual decisionmaker used an improper criterion in making the employment decision"). Additionally, the Fourth Circuit has held that discriminatory statements that are "remote[] in time" to an adverse action are insufficient evidence of discrimination. *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511–12 (4th Cir. 1994).

The record before the Court does not establish that Majors, or even Hollstein, were the actual decisionmakers who decided not to advance Plaintiff to the smaller candidate pool. Instead, the record evidence reflects that only Gill, Jones, Kiessling, and Howard were responsible for decision-making at the initial stage. *See* ECFs 46-8, 46-9, 46-10, and 46-11 (affidavits of panelists) and ECFs 46-12, 46-13, 46-14, and 46-15 (panelists' interview notes). All four panelists stated in sworn affidavits that they had no knowledge of Majors's comment at the time they conducted Plaintiff's interview and rated his performance in the spring of 2020. *See* ECFs 46-37, 46-38, 46-39, and 46-40 (panelists' second affidavits). Plaintiff points to no facts reflecting that the decision makers involved in his non-selection to the smaller candidate pool—that is, Gill, Jones, Kiessling, and Howard—were privy to, aware of, or influenced by Majors's comment. Though he argues that Majors had influence over the selection of candidates from the smaller pool, as did the recipient of the comment (Hollstein), Plaintiff offers no evidence connecting the decision-making process of the initial interview panelists with that of the later round interviewers. Plaintiff also argues that Hollstein appointed Gill and Jones to the initial panel even after the April 2018 meeting at which Gill, Hollstein, and Jones found no evidence of discrimination, ECF 47, at 14; however, this, too, does not advance Plaintiff's argument of direct discrimination based on Majors's "angry black man" comment, as it does not support any reasonable inference that either Majors made such

15

a comment to Gill, Jones, or any of the panelists, nor that Hollstein relayed Majors's comment. Finally, Majors made her comment to Hollstein in April 2018, nearly two years before the challenged non-selection in 2020. Two years is the amount of time contemplated by the Fourth Circuit in *Birckbeck* as being too remote to represent sufficient evidence of discrimination. 30 F.3d at 511–12. In sum, though the Court can appreciate that Plaintiff found Majors's comment distasteful and even offensive, Plaintiff does not provide any evidence linking the comment to his non-selection in 2020.

The Court next addresses Plaintiff's claims pursuant to the *McDonnell Douglas* burden-shifting standard. Under the *McDonnell Douglas* framework, in order to establish a claim for failure to promote under Title VII, "a plaintiff must show that he (1) is a member of a protected class; (2) applied for the position in question; (3) was qualified for the position; and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Barnes v. Charles Cnty. Pub. Schs.*, 747 F. App'x 115, 117 (4th Cir. 2018). "If the plaintiff makes such a showing, the defendant must respond with evidence that it acted on a legitimate, non-discriminatory basis." *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 341 (4th Cir. 2008). "If the defendant does so, the plaintiff is then obligated to present evidence to prove that the defendant's articulated reasons were pretext for unlawful discrimination." *Id.* "A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006).

As an initial matter, though Defendants concede that Plaintiff can satisfy the *prima facie* elements as to his race discrimination claim, they dispute that he can do so as to his sex discrimination claim, on the grounds that another male, Robert Griffiths, who is Caucasian, was

ultimately selected for the position of principal. ECF 46-1, at 18. In support of their position, Defendants cite *Langerman v. Thompson*, wherein the court held that "[i]n cases where the position sought was filled, the fourth prong is most easily satisfied by showing that someone outside of the plaintiff's protected group ultimately was selected for the position." 155 F. Supp. 2d 490, 495 (D. Md. 2001). The Fourth Circuit has also weighed in on the issue, explaining that, "[f]or example, when a female plaintiff is fired and the employer replaces her with another woman, that fact at least tends to show that the employer's motivation for firing the plaintiff was not her sex, because an employer is unlikely to hire a female replacement if its reason for firing the plaintiff was that she was female." *Miles v. Dell, Inc.*, 429 F.3d 480 (4th Cir. 2005). By contrast, other courts in this district and in the Fourth Circuit have treated Title VII claims as "intersectional" where they appear to posit that a person has been discriminated against "not only because of [their] sex, but because of both sex and some other characteristic." *Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 604 (D. Md. 2012) (quoting Dianne Avery et al., *Employment Discrimination Law* 352 (8th ed. 2010)); *see also Bliss v. Garland*, No. 1:22-CV-563, 2024 WL 5250349 (E.D. Va. Dec. 30, 2024). In keeping with this latter approach, the Court will construe Plaintiff's discrimination claim as being on the basis of his status as an African American man, *i.e.*, on the basis of both his race and sex. Accordingly, the Court concludes that Plaintiff has stated a *prima facie* claim for both sex and race discrimination.

The Court now considers whether Defendants have met their burden of showing they acted on a legitimate, non-discriminatory basis and determines that they have done so. The record reflects that Plaintiff was not selected because his scores fell below the threshold requirement of a score of 100, not because of a discriminatory animus. *See* ECF 46-17, at 1. Nor do the panelists' comments on how they arrived at their scores indicate any discriminatory rationale. None of the

17

comments reference Plaintiff's race or sex but instead focus on the quality of his responses to the questions posed and his conduct during the interview. *See* ECFs 46-12, 46-13, 46-14, and 46-15. Moreover, of the applicants who successfully passed the threshold and proceeded to the final selection phase, one was an African American man (Anthony Carroll), two were Caucasian males (Ryan Erickson and Robert Griffiths), and one was a Caucasian female (Ruth Finnegan). *See id.* and ECF 46-6, at 2. The advancement of Carroll—who received a score of 105, the second highest of all eight initial candidates—lends credence to Defendants' position that the scores were arrived at in a nondiscriminatory manner, as Carroll shares both of the same protected characteristics as Plaintiff does. ECF 46-17, at 1.

Plaintiff fails to carry his burden of rebutting Defendants' proffered reasons as pretextual. Though he takes issue with the "subjective" nature of the interview questions, ECF 47, at 7, subjectivity alone, while "relevant to a claim of [ ] discrimination," is insufficient to demonstrate pretext. *Barnes*, 747 F. App'x at 118 (quoting *Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989)). "Instead, 'there must be some evidence that the irregularity directly and uniquely disadvantaged a minority employee.'" *Id.* (quoting *Johnson v. Weld Cty.*, 594 F.3d 1202, 1213 (10th Cir. 2010)). Plaintiff has not provided any such evidence here, and indeed the record reflects that Carroll, the other African American male candidate, performed well in his initial interview.

Plaintiff also emphasizes his academic qualifications and experience, as he did in his interview. ECF 47, at 7. Nonetheless, a plaintiff bringing a failure to promote claim "may not choose the criteria on which [they] wish[] to compete with [other applicants] for the promotion," nor can they "establish pretext by relying on criteria of [their] choosing when the employer based its decision on other grounds." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271

(4th Cir. 2005). Though the questions asked by the panel may have been "subjective," they bore a clear relationship to the duties of a principal, such as liaising with parents, addressing staff concerns, and advancing student test scores. *See* ECF 46-12, at 1–3. Gill, Jones, Kiessling, and Howard all noted in their affidavits that they felt the questions had bearing on "qualities [they] believed were necessary" for a principal. *See, e.g.*, ECF 46-8, at 2 ¶ 7. The Court is not to second-guess their rationale but "assess[es] relative job qualifications based on the criteria that the employer has established as relevant to the position in question." *Heiko*, 434 F.3d at 259. Here, the record indicates that Plaintiff did not meet the qualifications set by the interviewers, and he has not offered any evidence that their rationale for not selecting him was pretextual. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VII claims.

### B.    42 U.S.C. § 1983 Claims against Hollstein and Hill

Section 1983 provides a cause of action against any "person" who, under color of state law, subjects a person within the jurisdiction of the United States to the "deprivation of any rights, privileges, or immunities secured by the Constitution" and federal law. 42 U.S.C. § 1983. "The standards for [section] 1983 claims of race discrimination in public employment are the same as those for Title VII race discrimination claims, so the claims may be analyzed together." *Rorie*, 653 F. Supp. 3d at 230 (citing *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004)). The same is true for sex discrimination claims. *See McCollough v. Town of S. Pines*, 439 F. App'x 215, 217 (4th Cir. 2011). Because the Court's "analysis with respect to Title VII also governs [P]laintiff's claims under 42 U.S.C. § [ ] 1983," so the Court determines that Defendants Hollstein and Hill are likewise entitled to summary judgment on the merits of Plaintiff's section 1983 claims. *See Grice v. Baltimore Cnty., Md.*, Civ. No. 07-1701-JFM, 2008 WL 4849322, at *11 (D. Md. Nov. 5, 2008), *aff'd*, 354 F. App'x 742 (4th Cir. 2009) (holding that "[i]f a plaintiff fails to establish that the

19

defendants violated [their] rights under Title VII, then [their] similar [s]ection 1983 claims must also fail").

### C.    MFEPA Claim

Count V of Plaintiff's complaint asserts a claim for violation of MFEPA, Md. Code State Government, § 20-606. MFEPA provides, in relevant part, that "an employer may not . . . (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of," *inter alia*, the individual's race, sex, or gender identity. Md. Code, State Government § 20-606(a)(1). MFEPA "is the state law analogue to Title VII." *Alexander v. Marriott Int'l, Inc.*, Civ. No. 09-02402-RWT, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011); *see also Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 743 n.8 (Md. 2007). "A claim under MFEPA is also analyzed under the *McDonnell Douglas* burden-shifting framework, in line with claims under Title VII." *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 275 (D. Md. 2023). As explained above, Plaintiff has failed to carry his burden under the *McDonnell Douglas* framework, and so Defendants are entitled to summary judgment on his MFEPA claims. *See, e.g., Ajisefinni v. CliftonLarsonAllen, LLP*, Civ. No. 19-3284-DLB, 2022 WL 17082367, at *6 (D. Md. Nov. 18, 2022), *aff'd sub nom. Ajisefinni v. Clifton Larson Allen, LLP*, No. 23-1100, 2023 WL 4700997 (4th Cir. July 24, 2023).

### IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED.

A separate implementing Order will issue.

Dated: <u>May 12, 2025</u>

<u>          /s/          </u>
Brendan A. Hurson
United States District Judge

20